WILLIAM H. METCALF, ADMINISTRATOR, APPELLEE, V.
CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COM-
PANY, APPELLANT.

FILED APRIL 19, 1919. No. 20283.

1. **Secondary Evidence.** Where the contents of an order to plain-
tiff's intestate, a section foreman, to measure overhead wires, is
an important issue in a case, and there is evidence that the order
has been lost, or was last seen in the hands of agents or em-
ployees of defendant, secondary evidence of its contents may
properly be received on behalf of the plaintiff.

2. **Trial: REBUTTAL TESTIMONY.** Where plaintiff's witnesses tes-
tify that they saw and read such order, that it was written in
pencil· with the name of the roadmaster attached, and defend-
ant's witnesses testify that the order given was typewritten and
mimeographed, and that no orders of this nature were ever given
in any other manner, it is not erroneous to permit other orders
to the section foreman in the form described by plaintiff's wit-
nesses to be introduced in rebuttal.·

3. **New Trial: NEWLY DISCOVERED EVIDENCE.** A motion for a new
trial upon the ground of newly discovered evidence, the evidence
in support of which is set forth in the opinion, *held*, properly
overruled.

4. **Appeal: CONFLICTING EVIDENCE.** Where the evidence is substan-
tially conflicting upon material points, the court, in determining
questions of law presented, accepts the verdict of the jury in
favor of the plaintiff as determining the facts upon such dis-
puted points.

5. **Trial: MOTION TO STRIKE.** A motion to strike the whole of an
answer to a question is properly overruled, if part of the answer
is properly admissible.

APPEAL from the district court for Lancaster county:
P. JAMES COSGRAVE, JUDGE. *Affirmed.*

*E. P. Holmes, Guy C. Chambers* and *George R. Mann,*
for appellant.

*C. J. Campbell* and *H. R. Ankeny, contra.*

LETTON, J.

On January 14, 1914, plaintiff's intestate, John T. Smith, was a section foreman upon the main line of defendant, running through the city of Mankato, Kansas. At that time deceased was directed to measure the height of overhead wires crossing the track upon the section of the road under his jurisdiction. Among other tools or appliances furnished him by defendant was a tapeline. Close to the station at Mankato two high voltage electric wires crossed the track. The tapeline furnished appears very much like an ordinary tapeline, but in reality it contains hidden metal wires, or strips running from end to end. Deceased threw the tapeline case attached to one end of the tapeline over the electric wires, holding the other end in his hand, when immediately a strong current of electricity passed along the line and through his body, killing him instantly. This action is brought by his widow to recover damages under the federal employers' liability act. A verdict for $10,000 was rendered. From a judgment upon the verdict, defendant appeals.

One of the material disputes as to the facts is as to whether the deceased had been ordered to measure the clearance of all wires crossing the track, or that of telephone wires only.

The testimony on behalf of plaintiff tends to prove that Smith had received a written order. Between the time of his death and the time his effects were delivered to plaintiff the next day, this order had disappeared. The coroner testified that the order was given to her by the undertaker, but she was unable to tell what disposition of it had been made by her, and it was not in her possession or control at the time of the trial. Several witnesses for the plaintiff testified that they had seen the order before the accident; that it was on an unruled piece of paper; that it was not typewritten, but written by hand; that the roadmaster's name

was at the bottom of it, and that the words, "telephone," or "telephone wires," did not appear in it, but that it was an order to measure all overhead wires.

A number of written orders received over the telegraph lines by the agent at Mankato giving specific orders by the roadmaster to the deceased were introduced in evidence by the plaintiff. The agent testifies that specific orders usually came by wire, but general orders were usually sent direct to the section foreman by railroad mail; such mail being inclosed in an envelope and delivered direct to the foreman.

Defendant objected very strenuously to the offering of these exhibits, since they did not refer to the measurement of wires, and were only orders to Smith as to certain work to be done upon the section. It is said that it is not shown that these orders came by wire, or that they were not dropped out of the window of the private car of the superintendent, or they did not come by railroad mail. But several of them are dated at Fairbury, and are addressed to the section foreman at Mankato, and some are written in pencil, and some typewritten. They bear upon their face evidence, which, considered in connection with the testimony of the station agent as to the receipt of specific orders by wire, convinces us that it was proper to admit them in evidence for the purpose of showing that Smith did receive other orders relating to his duties than printed or mimeographed orders sent to him by railroad mail.

Two witnesses testified to having seen the claim agent of the railway company and the station agent soon after the accident in the ticket office, and to have heard the claim agent read the order taken from Smith's body aloud to the other, to the effect that all overhead wires were to be measured, and remarked that "this looked bad," or words to this effect, and that this fact was impressed upon their minds for the reason that the railroad company afterwards was insistent that the

103 Neb.—28

order was only to measure telephone wires. This testimony is positively denied by the two men mentioned, and there are other circumstances in the record which rendered it of doubtful credibility.

On the other hand, witnesses for defendant testified that it was a general order typewritten and mimeographed, and was identical with exhibit 2, a copy of which appears in the record, and is as follows:

"Fairbury, Nebr., Jan. 12, 1914.
"All Foremen:

"Kindly advise me as soon as possible the number of telephone lines you have crossing our track on your section, giving this information by M. P. location, and clearance from top of rail to wires. Also advise name of telephone company.                J. L. Hayes."

Several other section foremen testified they received such an order. The coroner's testimony is somewhat indefinite. She said: "It was two or three lines, saying, measure all overhead telephone wires in a certain distance and before a given time." She thought it was a printed order about the size or a little longer than a telegraph blank, and it had printed characters across it; that it was written with pen or pencil. She afterwards said that it was typewritten or printed. The roadmaster testifies that the order above set out was the only order sent out by him as to the measurement of wires about this time. Considering that the order was either lost by the coroner, or was last seen in the hands of the agents of defendant, secondary evidence was admissible.

One of the alleged errors relied upon for reversal is the overruling of a motion for a new trial on account of newly discovered evidence. The evidence which is alleged to have been newly discovered is with reference to the relations existing between Smith, the deceased, and his wife at the time of his death. This is material

since, under the federal employers' liability act, a wife is only allowed to recover for pecuniary, loss resulting from the death of her deceased husband.

The facts alleged are, that, subsequent to the trial of the case, the attorney for the defendant received a letter from a justice of the peace at Tobias, Nebraska, to the effect that in April, 1912, the deceased was arrested and convicted upon the charge of failing to support his wife and children, and entered into a support bond; that afterwards he went to Kansas, and that the justice afterwards acted as intermediary between him and his wife, who still resided with her parents at Tobias; that for several months before Smith's death he refused to support his wife because she refused again to live with him at Mankato.

It was also shown by correspondence of Smith with the justice of the peace that Smith had agreed to live apart from her for six months while it was ascertained whether he was in good faith in his avowed intentions to support his wife and children; that deceased repeatedly stated that he loved his wife and children; that he was very anxious to have his wife return and live with him, and was arranging to buy furniture and provide a home at Mankato, though his later letters to the justice indicate that he was disappointed at her failure to come to him, and spoke of getting a divorce. He sent her money during this time.

The complaint filed at Tobias was against John Schmidt, while the name by which he was known to defendant was John T. Smith, and defendant urges this as a reason why by the use of ordinary diligence it was unable to ascertain these facts.

On the other hand, the testimony at the time of the inquest shows that the station agent and other employees of the defendant in Mankato knew, and the roadmaster, whose office and headquarters were at Fairbury, Nebraska, not far from Tobias, was then told by the plain-

tiff that Smith was not living with his family, and that his wife and children were living at Tobias.

In a counter affidavit by Mrs. Smith's mother, she deposes that Smith always provided for his wife and children, except for a period of about four or six weeks in March or April, 1913, when Smith and his wife were at the home of her parents, and that during that time Smith had trouble with the parents which resulted in his leaving their home; that she saw all the letters which Mrs. Smith received from her husband, and knew that the money, clothing, provisions and assistance which he sent were of about the value of $35 a month, except in November and December, 1913, when he sent her a part of this.

Mrs. Smith deposes that she never talked to the justice about the matter of rejoining her husband, except on one occasion about December 5, 1913, when she told him she was planning to join Smith in the near future. She did not know he was carrying on a correspondence with her husband; that the letters written by him were not authorized by her; that the money she received was sent directly to her; that the justice did not know the amount she was receiving; that the proceedings before the justice were had at his instance, and caused an estrangement of the family, and that from the latter part of April Smith had sent her about $30 a month, and also furnished her and the children with some articles of clothing. Considering all the facts in this connection, there was no error in this ruling.

At the trial Mrs. Smith, after having testified that she had made arrangements, at the time Smith was killed, to move to Mankato, was asked the following questions: "Q. Did you receive a letter from him? A. I did. Q. Even after he was dead, and written the day of his death, arranging for the furniture and all there at Mankato? A. I did."

Defendant then objected "as calling for the contents of the letter, and moves to strike out the answer as incompetent and immaterial." No objection was made to the question. The objection was to the answer as a whole. That portion of it in response to the question whether she received the letter after he was dead was competent testimony. The objection was too broad. Part of the answer was objectionable, but the motion should have been so framed as to ask the court to strike out the incompetent portion of the answer only. Under these circumstances it was properly overruled.

Two witnesses, Green, the station agent, and Argo, his assistant, testified that each of them had, in a conversation with Smith on the date of his death, warned him not to measure the electric light wires, that they were dangerous, and he might get killed. On cross-examination the testimony of Argo was so shaken as to make it, in our opinion, unworthy of credence, and this presumably was the conclusion reached by the jury. The testimony of Mr. Green, however, is direct and specific upon this point. There was a direct conflict between Green and other witnesses with respect to other facts as to which he testified. We cannot say that the contradiction of Green on other points did not influence the minds of the jury to such an extent that they rejected his testimony altogether with regard to this alleged warning.

Instruction No. 13 is complained of because it omitted to tell the jury that the two minor children were entitled to recover from their loss only until they should arrive at 21 years of age. Under the more recent decisions of the federal courts, it was unnecessary for the jury to make such an apportionment. The children were four and one years of age, respectively. The verdict under the instructions of the court, awarded $2,500 to the infant son, $2,500 to the infant daughter, and $5,000 to the widow. The amount of the verdict as a whole and

the amounts awarded to the infants are not excessive, and this assignment must be overruled.

The complaint as to the refusal to give instructions 12 and 13, requested by defendant, we think is not well founded, since in another instruction the jury were told that, if Smith was directed to measure all overhead telephone wires, and that he measured an electric wire carrying a high voltage, which was not included in the order, plaintiff could not recover. This is more specific than the instruction refused with regard to the nonliability of the defendant in case Smith had voluntarily measured the high voltage wires, and hence defendant suffered no prejudice. The instructions as a whole fairly submitted the issues to the jury.

It is argued that the fact that another section foreman measured wires by throwing a line over them, and then measuring the line, establishes the fact that Smith was careless in using the tapeline in the manner in which he did, and that the line itself discloses that it contained wires. The words, "Chesterman Metallic, Sheffield, England," are printed upon the back of this line, but an ordinary individual using the line would not be apt to notice this, and the line itself to an ordinary observer does not indicate the presence of fine interwoven wires.

The principal questions in the case are questions of fact. These have been resolved by the jury in favor of the plaintiff, and whatever doubt may exist in our minds must be considered settled by the verdict.

The deceased was a young man, strong and vigorous, and considering the amount which the testimony shows he had for years been in the habit of devoting to the support of his family, and the proof as to reconciliation, the amount of the verdict seems to be reasonable. The judgment of the district court is therefore

AFFIRMED.

CORNISH, J., not sitting.